UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

WILLIAM MCLOUGHLIN, *et al.*,

                  Plaintiffs,

    -against-                               1:18-CV-0487 (LEK/CFH)

RENSSELAER COUNTY DEPARTMENT
OF SOCIAL SERVICES, *et al.*,

                  Defendants.

---

## MEMORANDUM-DECISION AND ORDER

## I.    INTRODUCTION

The present action was brought by Plaintiffs William McLoughlin and Sovaira Mall on behalf of themselves and their infant son, DM, against the Rensselaer County Department of Social Services (RCDSS); two of its employees, Megan Golden and Jennifer Rosengart (the "Individual Defendants"); and an unidentified "John Doe" defendant, who allegedly removed DM from his parents' custody for three days, ordered a CT scan of DM against his parents' wishes, and filed an "indicated report" of child abuse against McLoughlin and Mall with the New York State Child Abuse Registry.

Plaintiffs filed suit pursuant to 42 U.S.C. § 1983. Against each Defendant, they allege: (1) violation of Plaintiffs' due-process rights and DM's Fourth Amendment rights for performing the CT scan, (2) false imprisonment, (3) violation of the Plaintiffs' due-process rights and DM's Fourth Amendment rights for removing DM from his parents' custody, (4) violation of the Eighth Amendment, (5) abuse of process, (6) malicious prosecution, (7) violation of Plaintiffs'

right to equal protection, and (8) violation of Plaintiffs' substantive due-process rights. Dkt. No. 1 ("Complaint") ¶¶ 58–90.

Defendants filed an answer and later moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c), arguing that the Complaint failed to state a <u>Monell</u> claim against RCDSS, that the individual Defendants had qualified immunity against all eight claims, and that all of the claims except the third and fifth failed to state a claim for relief. Dkt. Nos. 9 ("Answer"), 17-1 ("Defendants' Memorandum") at 8.[1] For the following reasons, Plaintiffs' claims against RCDSS are dismissed. For the remaining Defendants, Plaintiffs' Eighth Amendment, malicious prosecution, equal protection, and substantive due-process claims are dismissed. For all other claims, the Defendants' motion is denied.

## II.    BACKGROUND

Defendants contest many of Plaintiffs' allegations in the Answer, but for the purposes of the present motion the Court will only consider the facts as alleged in the Complaint. <u>Hayden v. Paterson</u>, 594 F.3d 150, 160 (2d Cir. 2010). Plaintiffs have also expressly incorporated a May 23, 2016 Decision After Hearing by the Bureau of Special Hearings of the State of New York Office of Children and Family Services (the "Hearing Bureau") into the Complaint. Dkt. Nos. 20 ("Plaintiffs' Opposition") at 7; 20-1 ("Hearing Bureau Decision"). Defendants agree that the Hearing Bureau Decision is incorporated into the Complaint and can be considered on their Rule 12(c) motion. Dkt. No. 21 ("Defendants' Reply") at 5.

---

[1]   The cited page numbers for documents refer to those generated by the Court's electronic filing system ("ECF").

McLoughlin and Mall are DM's parents. Compl. ¶ 1–2. McLoughlin is "White Caucasian" and Mall is Pakistani, meaning DM is a "mixed-race child." Id. ¶ 3. At around 10:30 PM on April 21, 2015, McLoughlin was doing laundry and placed DM (then three months old) on a clothes dryer. Id. ¶ 8. DM "kicked and slid off the dryer" about six inches onto a nearby table, and then another two or two-and-a-half feet onto the floor. Id. ¶ 9. He suffered a bump on his head and scrapes on his nose, knuckles, and knees. Id. ¶ 10. McLoughlin brought DM into the shower, which usually soothed DM when he was upset. Id. Eventually the infant "calmed down and was not exhibiting any signs of stress." Id. ¶ 11. McLoughlin left DM with his father so he could pick up Mall from work. Id. According to McLoughlin's father, DM was "smiling and happy" and did not show "any signs of distress" during this time. Id. At 11:15 PM, Mall returned with McLoughlin and decided to call DM's pediatrician. Id. ¶ 12. The on-call service advised McLoughlin and Mall to take DM to the emergency room. Id. ¶ 13.

The Plaintiffs arrived at the hospital around 12:10 AM and had DM examined by Dr. Jason Adam Jacque. Id. ¶ 14. Because DM only had a small bump on his head and was not exhibiting any disconcerting symptoms, Dr. Jacque did not think it was worth administering a CT scan and instead recommended that DM be kept for observation. Id. ¶ 14–15. Dr. Jacque explained that the "exposure to the high levels of radiation associated with the CT scan could be harmful to plaintiff DM and could cause cancer." Id. ¶ 15. The on-call physician from DM's pediatrician's office, Dr. Kroopnick, conferred with Dr. Jacque and agreed that DM was "clinically well" and only had to be kept for observation. Id. ¶ 16. Initially, Dr. Kathryn A. Hogan, another attending physician at the hospital, recommended giving DM a CT scan to check for internal injuries, but she later agreed that DM should only be kept for observation unless his

condition deteriorated. <u>Id.</u> ¶ 17. Dr. Hogan later testified that the decision to observe DM rather than give him a CT scan did not place DM in "an imminent risk of harm." Hr'g Bureau Decision at 12.

Defendant Golden is a child protective services caseworker employed by RCDSS, and is "White-Caucasian." <u>Id.</u> ¶¶ 5, 19. Defendant Rosengart is Golden's supervisor and is also an employee of RCDSS. <u>Id.</u> ¶ 6. While Plaintiffs were at the hospital, a call was placed to the New York State Central Abuse Register, and Golden was assigned to investigate the report. <u>Id.</u> ¶ 19. Golden insisted that DM receive a CT scan, but, based on Dr. Jacque's advice, McLoughlin and Mall refused unless DM's condition deteriorated. <u>Id.</u> ¶ 20. Golden later testified that she was not aware of the fact that DM's doctors had chosen to keep DM for observation rather than administer a CT scan. Hr'g Bureau Decision ¶ 24. Golden informed McLoughlin and Mall that if they did not consent to a CT scan, she would remove DM from their custody. Compl. ¶ 22. Eventually Mall agreed to give her consent. <u>Id.</u> Nonetheless, Golden, with Rosengart's approval, removed DM from his parents' custody because McLoughlin and Mall purportedly "refused to consent to a CT scan of [P]laintiff DM." <u>Id.</u> ¶¶ 23–25 (internal quotation marks omitted). The CT scan did not reveal any internal injuries. <u>Id.</u> ¶ 26.

Golden then placed DM in a foster home from April 21, 2015 until April 24, 2015, after which he was returned to his parents. <u>Id.</u> ¶¶ 29, 33. During the three days DM was separated from McLoughlin and Mall he was "wailing, crying and reaching out for his parents." <u>Id.</u> ¶ 49. Golden also filed an "indicated report" of child abuse against McLoughlin and Mall. <u>Id.</u> ¶ 34. An indicated report is a report with "some credible evidence of alleged abuse or maltreatment." Hr'g Bureau Decision at 8. The report was at least in part "based on [McLoughlin and Mall's] alleged

failure to follow through with the medical recommendation that [DM] receive a CT scan." Id. at 11. Plaintiffs allege that during the investigation Golden "exhibited certain negative behavioral gestures that were condescending towards plaintiff Mall," and that "Golden's unfavorable treatment of all of the plaintiffs was motivated by defendant Golden's racial animus and bias against Plaintiffs Mall and DM as Pakistani and Bi-racial respectively." Compl. ¶¶ 30–31.

At the time, McLoughlin was employed by the New York State Department of Victim Services, which had informed him that he could be terminated if they received an indicated report of child abuse. Compl. ¶¶ 35–36. The administrators of the little league baseball and basketball teams that he coached also informed McLoughlin that he would lose his coaching position if they received an indicated report. Id. McLoughlin and Mall requested a hearing challenging the indicated report. Id. ¶ 37. The Hearing Bureau found that the allegations of maltreatment were not supported by a fair preponderance of the evidence and amended the report from "indicated" to "unfounded." Hr'g Bureau Decision at 8, 13.

Plaintiffs filed the Complaint on April 19, 2018. Defendants answered on June 29, 2018, asserting eight defenses, three of which form the basis of their Rule 12© motion. Answer ¶¶ 98–105. Defendants filed the present motion on September 14, 2018, asserting that (1) all claims against RCDSS should be dismissed because the Complaint does not sufficiently allege a Monell claim; (2) all claims against the individual Defendants are barred by the doctrine of qualified immunity; and (3) six of the eight counts in the Complaint fail to state a valid constitutional claim. Defs.' Mem. at 8.

## III.   LEGAL STANDARD

The standard for a motion for judgment on the pleadings pursuant to Rule 12© is the same as the standard applied under Federal Rule of Civil Procedure 12(b)(6). <u>Bank of N.Y. v. First Millennium, Inc.</u>, 607 F.3d 905, 922 (2d Cir. 2010). Therefore the Court will take all factual allegations in the Complaint as true and draw all reasonable inferences in the non-movant's favor. <u>Jaffer v. Hirji</u>, 887 F.3d 111, 114 (2d Cir. 2018).

Plaintiffs cite <u>Conley v. Gibson</u> for the famously overturned proposition that a motion to dismiss must be denied "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Pls.' Opp'n at 14 (quoting 355 U.S. 41, 45–46 (1957)). Several of the claims in the Complaint as well as the arguments in Plaintiffs' Opposition seem to have been drafted with this standard in mind. In <u>Bell Atl. Corp. v. Twombly</u>, the Supreme Court "retire[d]" the <u>Conley</u> standard and replaced it with a requirement that the complaint meet the "plausibility standard." 550 U.S. 544, 563 (2007). Now, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009). While the Court must accept all factual allegations in the complaint as true, this does not extend to bare legal conclusions. <u>Id.</u>; <u>see also</u> <u>Twombly</u>, 550 U.S. at 555 ("[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." (internal quotation marks and alterations omitted)).

## IV.    DISCUSSION

### A.  <u>Monell</u> Claims Against RCDSS

When a plaintiff brings a § 1983 claim against a municipality they must not only show that their constitutional rights were violated, but also that the injury stemmed from the "execution of [the municipality's] policy or custom." <u>Monell v. Dep't of Soc. Servs. of City of N.Y.</u>, 436 U.S. 658, 694 (1978). A municipality cannot be held liable under § 1983 "solely on the basis of *respondeat superior*," so "a single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy." <u>Hillary v. St. Lawrence County.</u>, No. 17-CV-659, 2019 WL 977876, at *7 (N.D.N.Y. Feb. 28, 2019) (quoting <u>Ricciuti v. N.Y.C. Transit Auth.</u>, 941 F.2d 119, 122–23 (2d Cir. 1991)). Plaintiffs make three separate attempts to establish <u>Monell</u> liability: (1) a formal municipal policy; (2) approval and ratification of illegal activity; and (3) failure to train or supervise, all of which fail. Compl. ¶¶ 43–46.

Plaintiffs asserts that "RCDSS has a policy and practice of wrongfully using legitimate legal processes to achieve illegitimate collateral objectives," and that Golden was acting "in accordance with the policies, practices, customs and usages established by defendants Rosengart and RCDSS." <u>Id.</u> ¶¶ 44–45. However they do not support these conclusory allegations with any facts, such as other instances in which RCDSS employees abused legal processes.

Plaintiffs also assert that RCDSS "approved and ratified each and every unlawful act of defendant Golden" because it later denied a request to amend the indicated report and defended itself and Golden on appeal before the Bureau of Special Hearings. <u>Id.</u> ¶ 43,  Hr'g Bureau Decision ¶ 3, Pls.' Opp'n at 20. However, merely approving of a single unlawful act after the fact

does not establish that the municipality "ratified" the behavior in the meaning of <u>Monell</u>. <u>Waller v. City of Middletown</u>, 89 F. Supp. 3d 279, 287 n. 3 (D. Conn. 2015); <u>cf.</u> <u>Batista v. Rodriguez</u>, 702 F.2d 393, 397 (2d Cir. 1983) ("[Only] *persistent* failure to discipline subordinates who violate civil rights could give rise to an inference of an unlawful municipal policy of ratification of unconstitutional conduct within the meaning of <u>Monell</u>.") (emphasis added).

The Complaint states "[u]pon information and belief, defendant RCDSS failed to property train and/or supervise defendant Golden." Compl. ¶ 46. Plaintiffs can also establish <u>Monell</u> liability by showing a failure to train or supervise subordinates that demonstrates "deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes a 'deliberate choice.'" <u>Amnesty Am. v. Town of West Hartford</u>, 361 F.3d 113, 126 (2d Cir. 2004) (quoting <u>City of Canton v. Harris</u>, 489 U.S. 378, 388 (1989)). "Mere negligence" is insufficient. <u>Cash v. County of Erie</u>, 654 F.3d 324, 334 (2d Cir. 2011). However, the Complaint lacks any factual allegations that establish that RCDSS was conscious of but indifferent to the risk of a constitutional violation, or how any alleged insufficiency in Golden's training or supervision led to the claimed violations. Therefore the claims against RCDSS must be dismissed.

### B. Qualified Immunity

The Individual Defendants assert they "are entitled to qualified immunity as a matter of law since they did not violate any of the Plaintiffs' constitutional rights, and moreover, none of their alleged actions violated clearly established law as of April 21, 2015." Defs.' Mem. at 11. Qualified immunity shields government employees from liability under § 1983 in two circumstances: "(1) their conduct did not violate clearly established rights of which a reasonable

person would have known, or (2) it was objectively reasonable to believe that their acts did not violate these clearly established rights." Cornejo v. Bell, 592 F.3d 121, 128 (2d Cir. 2010) (alterations and internal quotation marks omitted). This "second . . . prong provides substantial protection for [child services] caseworkers, which is necessary because protective services caseworkers must choose between difficult alternatives." Id. (citations, alterations, and internal quotation marks omitted). However, qualified immunity is an affirmative defense and the burden is on Defendants to demonstrate that they are entitled to it for each claim. See Gomez v. Toledo, 446 U.S. 635, 640 (1980) ("[A] plaintiff [need not] allege bad faith in order to state a claim for relief . . . . It is for the official to claim that his conduct was justified by an objectively reasonable belief that it was lawful."). Therefore, the Court will consider qualified immunity along with the merits of each claim.

### C.  Violation of the Fourth Amendment and Procedural Due Process by Removing DM from his Parents' Custody

Plaintiffs claim Defendants' decision to remove DM from his parents' custody violated Plaintiffs' right to due process[2] and DM's Fourth Amendment rights. Compl. ¶¶ 66–71. Defendants do not contest that the Complaint states a constitutional claim, but maintain that they are entitled to qualified immunity. Defs.' Mem. at 8 n.1, 11–14.

### 1.  Procedural Due Process in the Child Services Removal Context

---

[2]  Plaintiffs have a separate claim for "substantive due process interference with plaintiffs' parent/child relationship." Compl. at 15. The Court understands ¶¶ 66–71 to refer to procedural due process only. Because the Defendants have moved to dismiss the substantive due-process claim for failure to state a claim and qualified immunity, the Court will consider that claim separately.

Parents have "a constitutionally protected liberty interest in the care, custody and management of their children," Southerland v. City of N.Y., 680 F.3d 127, 142 (2d Cir. 2012) (quoting Tenenbaum v. Williams, 193 F.3d 581, 593 (2d Cir. 1999)), and children have "a parallel constitutionally protected liberty interest in not being dislocated from the emotional attachments that derive from the intimacy of daily family association," id. (quoting Kia P. v. McIntyre, 235 F.3d 749, 759 (2d Cir. 2000)). Therefore, ordinarily it violates both the parents' and child's procedural due-process rights to remove a child without judicial process. Southerland, 680 F.3d at 142. However, as the state also has a "compelling interest in protecting children from abuse and neglect," Kia P., 235 F.3d at 759, it may act without a court order in "emergency circumstances," but only when "danger to the child is . . . so imminent that there is [not] reasonably sufficient time to seek prior judicial authorization, *ex parte* or otherwise." Tenenbaum, 193 F.3d at 594. This requires more than "the mere possibility of danger" or a "suspicion that the child might have been abused." Id. (citations and internal quotation marks omitted).

## 2. *The Fourth Amendment in the Child Services Removal Context*

A child is "seized" in the meaning of the Fourth Amendment when they are removed from their parent's custody by a child services caseworker. Tenenbaum, 193 F.3d at 602. The Second Circuit has not articulated a single standard for whether removal of a child without a warrant violates the Fourth Amendment, but has held that two potential "modes" of analysis are "exigent circumstances" and "probable cause."[3] Southerland, 680 F.3d at 157–58. Both

_____

[3]  The Second Circuit has also considered the possibility of applying a lower "special needs" standard, which only requires "reasonable cause." Southerland, 680 F.3d at 158–59; Tenenbaum, 193 F.3d at 604. While the court did not foreclose the possibility that such a

exceptions to the warrant requirement require that "information possessed by a state officer would warrant a person of reasonable caution in the belief that a child is subject to the danger of abuse if not removed . . . before court authorization can reasonably be obtained." Tenenbaum, 193 F.3d at 604–05. Therefore the standard for whether the removal violates the child's Fourth Amendment rights is "similar to the procedural due-process standard," namely that the child be in "imminent danger." Id. In both cases the danger to the child must be sufficiently serious, such as "the peril of sexual abuse, the risk that children will be left bereft of care and supervision, and immediate threats to the safety of the child." Southerland, 680 F.3d at 149–50 (citations omitted). A removal will not violate constitutional rights "where there is evidence of serious ongoing abuse and the officials have reason to fear imminent recurrence." Id. (citations omitted).

### 3. Qualified Immunity Analysis

Defendants claim "none of their alleged actions violated clearly established law as of April 21, 2015." Defs.'s Mem. at 11. However, Defendants have failed to demonstrate that the rights they allegedly infringed were not clearly established, and therefore they are not entitled to qualified immunity under the "first prong." In Southerland, which concerned a child-services removal in 1997, the Second Circuit vacated a ruling granting summary judgment to defendant caseworkers because (1) it was already "clearly established" law that due process required a court order or the presence of emergency circumstances for a child to be removed and (2) the "relevant standards" on what constituted an emergency had been sufficiently developed. 680 F.3d at

standard could ever be applied in the child services context, this Court sees no reason to find that "the requirement of obtaining the equivalent of a warrant where practicable [would] impose intolerable burdens" on the Defendants in this case. Southerland, 680 F.3d at 159 (quoting Tenenbaum, 193 F.3d at 604) (alterations omitted). Therefore, as in Southerland and Tenenbaum, the Court will not consider whether Defendants had "reasonable cause" to remove DM.

149–50 (citing <u>Hurlman v. Rice</u>, 927 F.2d 74, 80 (2d Cir. 1991)) ("Emergency circumstances mean circumstances in which the child is immediately threatened with harm, for example, where there exists an immediate threat to the safety of the child, or where the child is left bereft of care and supervision, or where there is evidence of serious ongoing abuse and the officials have reason to fear imminent recurrence."). In the Fourth Amendment context, it noted that although the issue of "whether probable cause or exigent circumstances must be established to justify a warrantless seizure" had not been settled, a child's "Fourth Amendment rights against unreasonable seizure were clearly established." <u>Id.</u> at 160–61. If the relevant law in this area was clearly established by 1997, or at least by 2012 when <u>Southerland</u> was decided, then it was clearly established when DM was removed in April 2015.

Defendants would still be entitled to qualified immunity under the "second prong" if they could demonstrate that it was objectively reasonable for them to believe they were not violating these clearly established rights. However, the Court cannot conclude, based on the allegations in the Complaint, that Defendants were objectively reasonable in believing that emergency circumstances, probable cause, or exigent circumstances existed, and therefore Defendants are not entitled to have this claim dismissed at this stage.

Defendants were concerned that DM was placed on the dryer "without any seat/baby carrier," Defs.' Reply at 6, and that McLoughlin and Mall waited two hours before bringing DM to the hospital, Defs.' Mem. at 13. While this might certainly cause a caseworker some concern, Defendants must establish that a reasonable caseworker would believe that, if DM were not immediately removed, he would be in imminent danger of harm before a court order could be obtained. It is unclear exactly what Golden knew when she made the decision to remove DM,

but, drawing all inferences in favor of Plaintiffs, the Court can infer she knew that Mall called

her pediatrician's office forty-five minutes after the fall and took DM to the emergency room as

soon as the on-call service told her to do so. See Compl. ¶¶ 12, 13. The Court can also infer that

she knew that for most of the two hours, DM was not exhibiting "signs of distress" and was

presenting as "clinically well." Compl. ¶¶ 11, 16. According to the Complaint, DM only had a

"small bump" and "scrapes," meaning there was no reasonable basis to conclude there was any

urgency to getting DM treatment, or that the delay posed a serious risk of harm. Id. ¶¶ 10, 14.

Nothing in the record indicates that there were previous injuries indicating "serious ongoing

abuse" or that DM was so "bereft of care or supervision" that he would be in danger if he was

allowed to return home with his parents.

Generally, courts have only held that it was objectively reasonable to believe negligence

warranted removal when there was not just a momentary lapse in supervision, but when there

was no guardian present or such an unfit guardian that the child was essentially without any

supervision at all. See, e.g., Duchesne v. Sugarman, 566 F.2d 817, 825–26 (2d Cir. 1977)

(holding an emergency situation warranting removal existed where a mother was committed to a

mental hospital and no one else could care for her children); Cecere v. City of N.Y., 967 F.2d

826, 827–29 (2d Cir. 1992) (holding that a child services officer temporarily transferring custody

of an infant from her mother to her grandmother was objectively reasonable because the mother

was addicted to drugs and alcohol and frequently left the child with relatives when she was

unable to care for her); Porter v. City of N.Y., No. 03-CV-6463, 2007 WL 1791149 at *4

(E.D.N.Y. June 19, 2007) (holding a removal was objectively reasonable where caseworkers

found a child in the care of his grandmother, who was drunk to the point of incapacitation). A

delay—or even a failure—to provide medical care will not necessarily establish "an imminent danger to the children's life or limb." <u>Southerland</u>, 680 F.3d at 135–36, 151 (declining to conclude that a social worker reasonably believed that emergency circumstances were established by, among other things, a father's failure to take his daughter to a doctor to treat a foot injury).

Defendants also argue that McLoughlin and Mall's refusal to consent to the CT scan warranted removal. Defs.' Mem. at 13. Plaintiffs contend they "explained to defendant Golden that the doctors had already determined that a CT scan was not necessary unless plaintiff DM's condition deteriorated." Compl. ¶ 20. Golden later testified that she was "not aware that the medical treatment plan had been determined to be observation." Hr'g Bureau Decision at 8. The Court must credit Plaintiffs' story at this stage. But in either case, it was not objectively reasonable to believe McLoughlin and Mall "adamantly refusing to consent to the child receiving a CT scan" placed DM at risk of imminent harm without learning whether DM's doctors thought the scan was necessary. Defs.' Mem. at 13.

Defendants argue that Plaintiffs' explanation for DM's injuries is an "interesting story" which "initially presents as unbelievable." Defs.' Reply at 5. Defendants also contend that they "were only contacted because AMC hospital personnel suspected child abuse/neglect had occurred." <u>Id.</u> at 6. Golden's reasons, if any, to doubt McLoughlin and Mall's explanation at the time she made the decision to remove DM, or any information which the hospital staff passed on to RCDSS and Golden before she arrived will be relevant at summary judgment or trial. But beyond the fact that "a suspected child abuse report was made," none of this material appears in the Complaint, and nothing more can be inferred. Compl. ¶ 19. Moreover, even if a hospital employee reasonably suspected *some* abuse or neglect, this does not lend credence to the belief

that DM was at risk of imminent harm warranting emergency removal. To conclude that objectively reasonable grounds for an emergency removal exist because a report was filed would effectively nullify the family's liberty interest in not being forcibly separated without due process. See Tenenbaum, 193 F.3d at 594–595 (holding that reports of sexual abuse against a father did not necessarily establish emergency conditions existed and noting that "[i]f, irrespective of whether there is time to obtain a court order, all interventions are effected on an 'emergency' basis without judicial process, pre-seizure procedural due process for the parents and their child evaporates.").

Defendants reliance on Cornejo v. Bell is misplaced. In that case the injuries to the child were much more serious than those DM sustained, doctors explicitly informed the social workers that they suspected abuse, and the parents had no explanation for the injuries. 592 F.3d at 125, 128–29. The defendant caseworkers were granted qualified immunity for removing an eighteen-month old from his mother's care after his infant brother suffered a heart attack, brain injuries, and a broken rib, which doctors informed them were consistent with violent shaking (and which caused the infant to die a week later). Id. Furthermore, the broken rib appeared to be several weeks old at the time the son was brought to the hospital. Id. Similarly, in Van Emrik v. Chemung Cty. Dep't of Soc. Servs., an infant suffered a spiral fracture in her leg, which doctors described as a "very suspicious" indication of child abuse, and which the child's caretakers could not explain. 911 F.2d 863, 864–65 (2d Cir. 1990). In addition, both of these cases were motions for summary judgment, where the court considered testimony from the defendant caseworkers—not motions for judgement on the pleadings. Cornejo, 592 F.3d at 127; Van

<u>Emrik</u>, 911 F.2d at 864. Therefore neither case is on point and warrants dismissal at the pleading stage.

### D. Violation of the Fourth Amendment and Due Process by Administering a CT Scan on DM

#### 1. Construing the Claim

Plaintiffs' first claim is entitled "Fourth Amendment Seizure Medical Examination (CT Scan) of Plaintiff DM at the Hospital." Compl. at 11. In the body of the claim, Plaintiffs allege that, "McLoughlin and Mall have a protected liberty interest in directing the medical care of their child," and "[t]he CT Scan ordered by the defendants was a direct violation of plaintiffs' Due Process Rights" without making further mention of the Fourth Amendment. <u>Id.</u> ¶¶ 59–60. Defendants argue that this claim is defective on two grounds: it fails to state a claim because there is no right to due process under the Fourth Amendment, and it is duplicative of Plaintiffs' false imprisonment claim. Defs.' Mem. at 27–28. Admittedly, the claim is confusing as written. However the Complaint provides adequate notice to Defendants that Plaintiffs mean to assert two related claims. First, as Plaintiffs elaborated in their Opposition, the reference to the Fourth Amendment should be read to allege that the CT scan "violated [DM]'s right to be secure in his person" and that it was a "forceful removal and unreasonable search and intrusion into [his] person." Pls.' Opp'n at 28–29.[4] See, e.g., <u>Tenenbaum</u>, 193 F.3d at 605–06. Second, Plaintiffs

_____

[4] After briefing on this motion was complete, Plaintiffs requested permission to amend the Complaint if the Court "finds there is any merit to defendants' argument in their Rule 12 motion." Dkt. No. 26. The Court will decide this motion based on the Complaint as-filed. Because such motions are considered in the first instance by the Magistrate Judge, this Court will not comment on the propriety of Plaintiffs' potential motion to amend. L.R. 7.1(b)(2).

16

claim that the CT scan violated Plaintiffs' due-process rights. See, e.g., Tenenbaum, 193 F.3d at 597–98.

Defendants also provide no explanation as to why the claim is duplicative of the false imprisonment claim, which concerns DM's confinement "in the hospital room and other hospital facilities and the foster home of a third party," Compl. ¶ 63, or why, even if duplicative, "it must be dismissed as a matter of law." Defs.' Reply at 12. Therefore, the Court construes the "first cause of action" to assert a procedural due-process claim and a Fourth Amendment claim on behalf of DM. Compl. ¶¶ 58–61. Because Defendants have moved to dismiss the entire Complaint based on qualified immunity, the Court will next analyze whether Golden and Rosengart are entitled to a defense to these two claims.

### 2. Qualified Immunity

#### a. Procedural Due Process in the Medical Examination Context

The Individual Defendants assert "none of their alleged actions violated clearly established law as of April 21, 2015." Defs.' Mem. at 11. However, it was already clearly established in this circuit that "the constitutional liberty interest of parents in the 'care, custody, and management of their child,' . . . includes a significant decision-making role concerning medical procedures sought to be undertaken by state authority upon their children." Van Emrik, 911 F.2d at 867 (quoting Santosky v. Kramer, 455 U.S. 745, 753 (1982)). Therefore, a medical procedure cannot be undertaken without parental consent "for investigative purposes at the behest of state officials" without due process. Id.; Tenenbaum, 193 F.3d at 598–99 (finding that a gynecological examination of a child at a social workers' behest and without a court order or parental consent violated her and her parents' procedural due-process rights). As with removals,

emergency examinations do not require a court order if the child is in "imminent danger." Id. at 599.

### b. The Fourth Amendment in the Medical Examination Context

The Second Circuit has also found that when "procedures undertaken at the initiative of a state official serve primarily an investigative function" the "Fourth Amendment and bodily integrity interests of the child are implicated." Van Emrik, 911 F.2d at 867. Again, the standard is the same as the one for emergency removals, i.e. a caseworker does not violate the Fourth Amendment if "reasonable or probable cause or exigent circumstances justifying an emergency examination . . . exist[] at the time the examination was performed." Tenenbaum, 193 F.3d at 606.

If a procedure is "medically indicated," that is, ordered by a medical professional and "designed for treatment" then the caseworker will not be held liable. Id. at 599; see also Chayo v. Kaladjian, 844 F. Supp. 163, 169 (S.D.N.Y. 1994) ("[M]edically *necessary* x-rays may be taken without judicial approval or parental consent.") (emphasis added). It is unclear if the unwarranted medical examination needs to be both medically unnecessary and investigatory to violate due-process rights or the Fourth Amendment, but when an examination is brought at the request of an investigating social worker rather than a doctor, it is at least plausible that the motive was to investigate child abuse. See Van Emrik, 911 F.2d at 867 (finding an x-ray was not medically indicated where a social worker requested them although the physician "initially opposed them because of concern about radiation"); Tenenbaum, 193 F.3d at 599 (holding that an examination was not medically indicated where it was ordered by a social worker investigating sexual abuse even though it was also meant to uncover possible injuries). Cf. Chayo, 844 F. Supp. at 170

(granting summary judgment for defendant caseworkers on qualified immunity grounds where a "non-party physician [took] full responsibility for the decision to order x-rays" and "there [was] no evidence that the caseworkers even mentioned x-rays, much less requested they be taken").

   c.   Analysis

It is unclear from the face of the Complaint whether the CT scan was taken for investigative purposes. Defendants claim that the CT scan was necessary to determine that DM "did not sustain any internal injuries or fractures." Defs.' Mem. at 14. However, Defendant was present at the hospital to investigate a report of suspected child abuse, which ultimately resulted in a report being filed against McLoughlin and Mall, Compl. ¶¶ 19, 34, and DM's doctors had already determined the CT scan was unnecessary, Compl. ¶¶ 15–17. Defendants admit that "Golden advocated for DM to receive a CT scan." Defs.' Mem. at 14. Therefore, the Complaint plausibly states a claim that DM's CT scan "serve[d] primarily an investigative function," and therefore violated Plaintiffs' due-process rights and DM's Fourth Amendment rights according to clearly established law. Van Emrik, 911 F.2d at 867.

Defendants also claim they are entitled to qualified immunity because it was objectively reasonable to believe that DM needed a CT scan and that there was no time to obtain a court order. Defs.' Mem. at 13–14. However, as with the claims regarding their decision to remove DM, the Court cannot agree that it was objectively reasonable to believe DM was in "imminent danger," or that "probable cause" or "exigent circumstances" warranting an emergency examination existed at the time. Defendants claim that they believed DM had "serious or fatal injuries," and "injuries which they knew could prove fatal." Id.; Defs.' Reply at 7. However these assertions contradict the allegations in the Complaint that DM had a "small bump" on his head

and was "clinically well" when Golden arrived. Compl. ¶¶ 14, 16. Two of DM's doctors did not

recommend administering a CT scan, and another agreed to observation and later testified that

DM was not "placed at imminent risk of harm by the decision to observe him." Compl. ¶¶ 15–17,

39.

Defendants also point out that the "scan was nevertheless authorized and administered by

the medical doctors who were treating DM—evidencing the fact that the scan was, at the very

least, objectively reasonable under the circumstances." Defs.' Mem. at 14. The question is not

whether administering the CT scan was reasonable. It is whether it was objectively reasonable to

believe that DM was in immediate danger and therefore that administering the CT scan without

parental consent would not violate the Plaintiffs' constitutional rights. Defendants' contention

that "[s]imply because the Plaintiffs are not happy with the Defendants' judgment does not

demonstrate that such actions violated clearly established law," reflects the exact indifference to

parents' preferences for their childrens' medical care that the Constitution prohibits. Id.; see

Parham v. J.R., 442 U.S. 584, 602–03 (1979) ("[O]ur constitutional system long ago rejected any

notion that a child is the mere creature of the State . . . . Simply because the decision of a

parent . . . involves risks does not automatically transfer the power to make that decision from the

parents to some agency or officer of the state.") (internal quotation marks omitted). Thus,

Defendants are not entitled to have the claim dismissed on qualified immunity grounds.

### E.  Substantive Due Process

Families have "a substantive right under the Due Process Clause 'to remain together

without the coercive interference of the awesome power of the state.'" Tenenbaum, 193 F.3d at

600 (quoting Duchesne, 566 F.2d at 825). Plaintiffs claim Defendants violated their substantive

due-process rights to familial association. Compl. ¶¶ 86–90. Where the Constitution "provides an explicit textual source of constitutional protection . . . the more generalized notion of substantive due process" is an inappropriate basis for the claim. <u>Tenenbaum</u>, 193 F.3d at 599–600 (internal quotation marks omitted). As discussed above in Section C, children are seized within the meaning of the Fourth Amendment when they are removed from their parents' care by the government. <u>Id.</u> As a result, such claims on behalf of the child are construed as being brought under the Fourth Amendment rather than substantive due process. <u>Id.</u> Therefore, DM's substantive due-process claim is dismissed.

The Complaint also fails to state a claim for violation of McLoughlin and Mall's substantive due-process rights. As with procedural due-process claims, the parents' interest must be balanced against the "compelling governmental interest in the protection of minor children." <u>Southerland</u>, 680 F.3d at 152. However, unlike a procedural due-process claim, the removal must be "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." <u>Id.</u> at 151. In other words, the removal must be so shocking that "the Due Process Clause would not countenance it even were it accompanied by full procedural protection." <u>Tenenbaum</u>, 193 F.3d at 600. A temporary removal, even if done in a manner that violates procedural due process, will generally not rise to this level because it "does not result in parents' wholesale relinquishment of their right to rear their children." <u>Id.</u> at 600 (quoting <u>Joyner v. Dumpson</u>, 712 F.2d 770, 778 (2d Cir. 1983)); <u>Southerland</u>, 680 F.3d at 152–153. Courts have found that removals to investigate reports of child abuse do not violate substantive due-process rights when the child is returned or the removal is confirmed by court order in less than four days. <u>Id.</u> at 153–54 (collecting cases).

Although the Complaint states a claim for violation of procedural due process, the three-day separation at issue here does not rise to the level of a wholesale relinquishment of McLoughlin and Mall's right to raise DM. Therefore, Plaintiffs' substantive due-process claim is dismissed.

### F. Section 1983 False Imprisonment

#### 1. Merits

In their false imprisonment claim, Plaintiffs allege that Defendants "confine[d] plaintiff DM in the hospital room and other hospital facilities and the foster home of a third party." Compl. ¶ 63. False imprisonment requires four elements: (1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged. Willey v. Kirkpatrick, 801 F.3d 51, 70–71 (2d Cir. 2015). Defendants contend that the Complaint does not sufficiently plead the last three elements. Defs.' Mem. at 24–26.

With reference to the second and third element Defendants claim that Plaintiffs cannot demonstrate that three-month-old DM could not be conscious of, or did not consent to, his confinement. Id. at 24–25. In their opposition, Plaintiffs note that according to some older New York State authorities, when the plaintiff is an infant or incompetent "the action may be predicated upon his restraint or removal against the will of the party having his legal custody." Kajtazi v. Kajtazi, 488 F. Supp. 15, 18 (E.D.N.Y. 1978) (citing Barker v. Washburn, 93 N.E. 958, 959–60 (N.Y. 1911)); see Pls.' Opp'n at 26. However, this "proposition no longer represents New York law." Estiverne v. Esernio-Jenssen, 833 F. Supp. 2d 356, 381 n.19 (E.D.N.Y. 2011) (citing Sager v. Rochester Gen. Hosp., 647 N.Y.S.2d 408, 410 (Sup. Ct. 1996) (granting

summary judgment to defendants where there was no evidence that a five month old was conscious of her confinement at a hospital)); see also Parvi v. City of Kingston, 362 N.E.2d 960, 963 (N.Y. 1977) (noting that questions over whether "awareness of confinement by one who has been falsely imprisoned should be a sine qua non for making out a case" have been "laid . . . to rest in this State"). False imprisonment is a "dignitary tort" and therefore there is no injury unless "the victim knows of the dignitary invasion." Parvi, 362 N.E.2d at 963 (emphasis added). Therefore, DM must have been conscious of his confinement to have a claim for false imprisonment.

However, courts have declined to find that it is per se implausible for an infant to be conscious of their confinement. See V.S. ex rel. T.S. v. Muhammad, 581 F. Supp. 2d 365, 384 (E.D.N.Y. 2008) (rev'd on other grounds V.S. v. Muhammad, 595 F.3d 426 (2d Cir. 2010) (holding that it was plausible that a 22 month old was "conscious of her prolonged separation from her parents" and her confinement where the complaint alleged she "suffered extreme humiliation, pain and suffering, terror, mental anguish and depression"); Estiverne v. Ersernio-Jenssen, 581 F. Supp. 2d 335, 349 (E.D.N.Y. 2008) (declining to dismiss unlawful imprisonment claim on the theory that "a nine-month-old infant cannot, as a matter of law, be conscious of confinement"). Moreover, a plaintiff is not required to remember their confinement later, if there is evidence they were conscious of it at the time. Parvi, 362 N.E.2d at 963.

Here, Plaintiffs allege that DM was "conscious of his seizure during the approximately 3 days and 3 nights that he was placed in the custody of total strangers, as shown by his wailing, crying, and reaching out for his parents." Compl. ¶ 49. This description of DM's behavior plausibly states a claim that he was aware of his confinement and did not consent to it.

Defendants also contend that the confinement was privileged because there was an "emergency situation concerning the life or health of the child." Defs.' Mem. at 25. The standard to determine whether an emergency is serious enough to privilege a child's confinement is the same as the standard to determine whether a child can be removed from their parents' custody without a court order. See Trombley v. O'Neill, 929 F. Supp. 2d 81, 102 (N.D.N.Y. 2013) (citing Southerland, 680 F.3d at 149).

As discussed in Section C above, there were no reasonable grounds to remove DM based on the information available to Golden at the hospital. In any event, there was certainly no reason to believe DM was in imminent danger when he was placed in foster care after the CT scan showed he had no serious injuries. Compl. ¶ 29. Therefore the Complaint plausibly states that the confinement was not privileged.

### 2. Qualified Immunity

For the same reasons that the Complaint plausibly states that DM's confinement was not privileged because no emergency existed, as well as the reasons Defendants are not entitled to qualified immunity outlined in Sections C and D above, it was not objectively reasonable for Defendants to believe that confining DM did not violate his constitutional rights. Therefore Defendants are not entitled to have this claim dismissed on qualified immunity grounds.

### G.  Violation of the Eight Amendment by administering the CT Scan on DM

Plaintiffs claim Defendants violated DM's Eighth Amendment rights when they forced him "to undergo a potentially cancer-causing medical procedure." Compl. ¶ 73. Defendants correctly point out that the Eight Amendment only applies to convicts. See Weyant v. Okst, 101 F.3d 845, 856 (2d Cir. 1996). Plaintiffs counter that pre-trial detainees are entitled to similar

rights under the due-process clause of the Fourteenth Amendment, and that "a detainees rights are 'at least as great as the Eight Amendment protections available to a convicted prisoner.'" Pls.' Opp'n at 21–22; see also Darnell v. Piniero, 849 F.3d 17, 29 (2d Cir. 2017) (quoting City of Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244 (1983)). They ask that the claim "be analyzed under the Fourteenth Amendment Due Process provision, as set forth by the Second Circuit in Darnell." Pls.' Opp'n at 22.

Defendants respond that DM was never arrested and was not a pre-trial detainee. Defs.' Reply at 8. However, even assuming children in protective custody have the same substantive due-process rights as pre-trial detainees, the CT scan did not violate these rights. In this context, the test for a § 1983 claim for violation of the Eighth Amendment or substantive due process under the Fourteenth Amendment includes "an 'objective prong' showing that the challenged conditions were sufficiently serious to constitute objective deprivations of the right to due process, and a 'subjective prong' . . . showing that the officer acted with at least deliberate indifference to the challenged conditions." Darnell, 849 F.3d at 29. The objective prong requires "conditions, either alone or in combination [which] pose an unreasonable risk of serious damage to [plaintiff's] health, which includes the risk of serious damage to physical and mental soundness." Id. at 30 (citation and internal quotation marks omitted). An "objective deprivation" occurs where the confined individual is "exposed to conditions that pose an unreasonable risk of serious damage to their future health." Id. (quoting Jabbar v. Fischer, 683 F.3d 54, 57 (2d Cir. 2012)) (alterations omitted). To violate the Constitution, an environmental hazard must be "so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a

risk," and it must be "not one that today's society chooses to tolerate." Helling v. McKinney, 509 U.S. 25, 36 (1993).

Although ordering the scan against McLoughlin and Mall's wishes and in the absence of an emergency arguably violated the Fourth Amendment and procedural due process, it did not "pose an unreasonable risk of serious damage" to DM's health. Darnell, 849 F.3d at 30. CT scans are a commonplace medical procedure, indicating "society chooses to tolerate" the low risk of cancer. See In re RadPro SecurPass Scanner Cases, No. 13–CV–6095, 2014 WL 4054310, at *7 (S.D.N.Y. Aug. 13, 2014) (rejecting an Eighth Amendment claim for exposure to x-ray machines in prison). The fact that one of DM's pediatricians initially recommended a CT scan indicates that the scan did not pose an "unreasonable risk of serious harm." Compl. ¶ 17. Therefore the Complaint does not state a claim for violation of the Eighth Amendment or DM's Fourteenth Amendment rights under Darnell.

### H. Section 1983 Malicious Prosecution

Plaintiffs also assert a § 1983 malicious prosecution claim against defendants for filing the indicated reports against McLoughlin and Mall. Compl. ¶¶ 78–82. A state law malicious prosecution claim requires, "(1) the commencement or continuation of a criminal proceeding by the defendant(s) against the plaintiff; (2) the termination of the proceedings in plaintiff's favor; (3) the absence of probable cause for the criminal proceeding; and (4) actual malice." Nieves v. County of Monroe, 761 F. Supp. 2d 48, 51 (W.D.N.Y. 2011). "In order to prevail on a § 1983 claim against a state actor for malicious prosecution, a plaintiff must show a violation of his

rights under the Fourth Amendment,[5] and establish the elements of a malicious prosecution claim under state law."[6] <u>Fulton v. Robinson</u>, 289 F.3d 188, 195 (2d Cir. 2002). Defendants raise a multitude of deficiencies in Plaintiffs' malicious prosecution claim but the Court need only address one: the failure to plead a violation of their Fourth Amendment rights.

To establish a violation of the Fourth Amendment there must be "some deprivation of liberty consistent with the concept of 'seizure.'" <u>Washington v. Cty. of Rockland</u>, 373 F.3d 310, 316 (2d Cir. 2004) (quoting <u>Singer v. Fulton Cty. Sheriff</u>, 63 F.3d 110, 116 (2d Cir. 1995)). While "liberty deprivations regulated by the Fourth Amendment are not limited to physical detention," <u>Murphy v. Lynn</u>, 118 F.3d 938 (2d Cir. 1997), courts have required the plaintiff be subject to something akin to a restraint on physical freedom. <u>See id.</u> (holding restriction of constitutional right to travel out of the state and requirement to appear for trial and other hearings on demand amounted to seizure); <u>Rohman v. N.Y.C. Transit Auth.</u>, 215 F.3d 208, 216, (2d Cir. 2000) (same); <u>Noga v. Schenectady Police Officers</u>, 169 F. Supp. 2d 83, 91 (N.D.N.Y. 2001) (same). <u>Cf.</u> <u>Burg v. Gosselin</u>, 591 F.3d 95, 101 (2d Cir. 2010) ("A pre-arraignment, non-felony summons requiring no more than a later court appearance does not constitute a Fourth Amendment seizure."). Impositions resulting from civil or administrative proceedings rarely rise

---

[5] The Second Circuit in <u>Singer</u> noted that it was "theoretically possible . . . for a plaintiff to premise a malicious prosecution claim on some other constitutional right." 63 F.3d at 116 n.5, 120 (considering but rejecting a First Amendment retaliation malicious prosecution claim). However, Plaintiffs have not cited a case where such a claim was allowed.

[6] Recently, the Second Circuit has clarified that "federal law defines the elements of a § 1983 malicious prosecution claim . . . a State's tort law serves only as a source of persuasive authority rather than binding precedent in defining these elements." <u>Lanning v. City of Glens Falls</u>, 908 F.3d 19, 25 (2d Cir. 2018). However, because the Court is dismissing this claim on constitutional grounds, it need not determine whether any material differences exist in this case between the elements of state and federal malicious prosecution claims.

to the level of a Fourth Amendment violation. See Washington, 373 F.3d at 316. Although, as discussed above in Section C, removing a child can constitute a "seizure" in violation of the child's Fourth Amendment rights, the commencement of abuse investigations do not implicate Fourth Amendment rights. Estiverne, 833 F. Supp. 2d at 380 (finding parents were not seized or restrained by an abuse investigation); Emerson v. City of N.Y., 740 F. Supp. 2d 385, 392 (S.D.N.Y. 2010) (same).

Plaintiffs rely on Valmonte v. Bane, 18 F.3d 992, 1001 (2d Cir. 1994), for the proposition that indicated reports of child abuse can implicate a liberty interest when they result in "stigma plus" other deleterious consequences such as a "tangible burden on . . . employment prospects." Pls.' Opp'n at 30. However, that case only concerned procedural due-process rights under the Fourteenth Amendment, and does not mention the Fourth Amendment. Id. at 1004–05. There is no precedential support for Plaintiffs' view that violation of this liberty interest could form the basis of a malicious prosecution claim. Plaintiffs also claim that because New York State recognizes the tort of civil malicious prosecution, the Court should recognize § 1983 liability in similar circumstances because "the analysis of the state and the federal claims is identical." Pls.' Opp'n at 30 (quoting Boyd v. City of N.Y., 336 F.3d 72, 75 (2d Cir. 2003)). However, Boyd concerned the "elements" of malicious prosecution, not the additional requirement that a constitutional right be violated to bring a § 1983 claim.[7] Id. In Washington v. County of Rockland, the Second Circuit explicitly rejected a similar argument, noting that while Supreme Court and Second Circuit precedent do not foreclose the possibility that a civil proceeding could

_____

[7] Even this limited holding is no longer correct as a matter of federal law. See Lanning, 908 F.3d at 25.

give rise to a malicious prosecution claim, they still require a violation of the Fourth Amendment. 373 F.3d at 315–17 (citing Albright v. Oliver, 510 U.S. 266, 273–74 (1994); Singer, 63 F.3d at 116–17).

Although the Complaint mentions that the indicated reports put McLoughlin's job and ability to volunteer coach in jeopardy, it does not show he was subject to any restraints that would amount to a "seizure." Compl. ¶¶ 35–36. Therefore, the Complaint fails to state a § 1983 claim for malicious prosecution.

## I.  Section 1983 Abuse of Process

Plaintiffs claim that Defendants committed abuse of process by filing the indicated reports against McLoughlin and Mall. Compl. ¶¶ 74–77. Under New York State law, the elements of abuse of process are that the defendant "(1) employs regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse or justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." Cook v. Sheldon, 41 F.3d 73, 80 (2d Cir. 1994) (citing Curiano v. Suozzi, 469 N.E.2d 1324, 1326 (N.Y. 1984)). A § 1983 abuse of process claim also requires the plaintiff to allege the violation of a constitutional right. Id. Defendants do not contest that the Complaint states a claim for abuse of process. Defs.' Mem. at 8 n. 1. However, Defendants have moved to dismiss the entire Complaint "since the individual County Defendants are entitled to qualified immunity." Id. at 8. Defendants provide no reason that the law on abuse of process was not clearly defined, or why any actions they took which did amount to abuse of process were objectively reasonable. This Court "need not entertain an argument that was not briefed."

<u>Johannes Baumgartner Wirtschafts- und Vermogensberatung GmbH v. Salzman</u>, 969 F. Supp. 2d 278, 290 (E.D.N.Y. 2013).

Defendants do argue in the context of the malicious prosecution claim that they should be entitled to qualified immunity because it was "objectively reasonable" to believe there was some credible evidence of abuse, which is the standard for filing an indicated report. Defs.' Mem. at 30–31. However, while "malicious prosecution and abuse of process are closely allied," only malicious prosecution "concerns the improper issuance of process." <u>Cook</u>, 41 F.3d at 80. In contrast, the "gist" of abuse of process is "improper use of process after it is regularly issued." <u>Id.</u> Even if Defendants had probable cause to file the indicated report, it would not have been objectively reasonable to believe their actions were lawful if they did so "to obtain a collateral objective that is outside the legitimate ends of the process." <u>Id.</u> Because Defendants did not address this claim, they are not entitled to have it dismissed.

### J. Equal Protection

Plaintiffs originally claimed that Defendants "discriminated against plaintiffs Mall and DM on the basis of their race, color, and/or religion." Compl. ¶ 84. In the Plaintiffs' Opposition however, they seem to advance a claim under a "class of one" theory. Pls.' Opp'n at 22–23 (quoting <u>Village of Willowbrook v. Olech</u>, 528 U.S. 562, 564 (2000)). In either case, the Complaint fails to state a claim.

To state a claim for selective enforcement of the law based on racial or religious identity, a plaintiff must allege "(1) the person, compared with others similarly situated, was selectively treated, and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion." <u>Hu v. City of N.Y.</u>, 927 F.3d 81, 91

(2d Cir. 2019) (quoting <u>Zahra v. Town of Southold</u>, 48 F.3d 674, 683 (2d Cir. 1995)). To succeed under a "class of one" theory, the plaintiff must demonstrate "(1) that [they have] been intentionally treated differently from others similarly situated and (2) that there is no rational basis for the difference in treatment." <u>Id.</u> (citing <u>Village of Willowbrook</u>, 528 U.S. at 564). For either claim, "it is axiomatic that a plaintiff must allege that similarly situated persons have been treated differently." <u>Gagliardi v. Village of Pawling</u>, 18 F.3d 188, 193 (2d Cir. 1994).

Plaintiffs allege "[u]pon information and belief, defendants do not treat similarly situated White/Caucasian members of the community as unfairly as they treated plaintiffs in this case." Compl. ¶ 32. Plaintiffs also claim that "Golden exhibited certain negative behavioral gestures that were condescending towards plaintiff Mall" and that "Golden's unfavorable treatment of all of the plaintiffs was motivated by defendant Golden's racial animus and bias against plaintiffs Mall and DM as Pakistani and Bi-racial respectively." <u>Id.</u> ¶¶ 30, 31. However, such conclusory statements are insufficient to make out a claim for discrimination. <u>Thomas v. Pingotti</u>, No. 17-CV-300, 2017 WL 3913018 at *7 (N.D.N.Y. Sept. 6, 2017) (dismissing an inmate's equal-protection claim, which was only supported by a "conclusory assertion that inmates of other races, religions, and gender were treated differently by defendants"). The Complaint contains no specific allegations at all about Defendants' treatment of similarly situated families that would suggest that Defendants discriminated against Plaintiffs. Therefore, Plaintiffs' § 1983 equal-protection claim is dismissed.

## V.    CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Defendants' Motion for Judgment on the Pleadings (Dkt. No. 17) is **GRANTED** as to all claims against Defendant Rensselaer County Department of Social Service; and it is further

**ORDERED,** that Defendants' motion is **GRANTED** as to Plaintiffs' Eighth Amendment, malicious prosecution, equal protection and substantive due-process claims against Defendants Megan Golden, Jennifer Rosengart, and John Doe; and it is further

**ORDERED,** that Defendants' motion is **DENIED** as to Plaintiffs' Fourth Amendment and procedural due-process claims relating to the CT scan and removal of DM, false-imprisonment claim, and abuse-of-process claim against Defendants Megan Golden, Jennifer Rosengart, and John Doe.

**IT IS SO ORDERED.**

DATED:      August 14, 2019
             Albany, New York


Lawrence E. Kahn
U.S. District Judge